IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2020 Term

_____

No. 19-0572
_____

**FILED**
**November 12, 2020**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

EQT PRODUCTION COMPANY,
Defendant Below, Petitioner

v.

ANTERO RESOURCES CORPORATION,
Plaintiff Below, Respondent

_____

Appeal from the Circuit Court of Tyler County
The Honorable Jeffrey Cramer, Judge
Action No. 17-C-3

AFFIRMED
_____

Submitted:  October 13, 2020
Filed:  November 12, 2020

David K. Hendrickson, Esq.                    Corey L. Palumbo, Esq.
Hendrickson & Long, PLLC                      Joshua A. Cottle, Esq.
Charleston West Virginia                      Bowles Rice LLP
Counsel for Petitioner                        Counsel for Respondent

JUSTICE WORKMAN delivered the Opinion of the Court.

**SYLLABUS BY THE COURT**

1.      "A circuit court's entry of a declaratory judgment is reviewed *de novo*."  Syl. Pt. 3, *Cox v. Amick*, 195 W. Va. 608, 466 S.E.2d 459 (1995).

2.      Where multiple leases, such as an oil and gas base lease and a top lease, exist on the same property, the provisions of the West Virginia Recording Act, West Virginia Code §§ 40-1-8 to -9 (2019), govern which lease has priority.

**WORKMAN, Justice:**

Petitioner EQT Production Company (also referred to as "EQT") appeals the order entered by the Circuit Court of Tyler County on January 3, 2019, and the amended order entered on May 23, 2019, both granting respondent Antero Resources Corporation (also referred to as "Antero") partial summary judgment on its claim for declaratory judgment. The sole issue raised on appeal is whether the circuit court erred by granting summary judgment in favor of Antero on its declaratory judgment claim, concluding that the Antero Top Lease takes priority over the EQT Base Lease, as amended, covering the same property. Upon review of the parties' briefs and arguments, the appendix record, and the applicable law, we find no error committed by the circuit court's decision and we therefore affirm.

## I. Facts and Procedural Background

For purposes of this appeal, the facts are undisputed. The defendants below, Larry W. Lemasters and Linda J. Lemasters ("the Lemasters"), own 100% of the oil and gas within and underlying a certain tract of land containing 15.25 acres, located in Ellsworth District, Tyler County, West Virginia, designated for tax assessment purposes as Tax Map 23, Parcel 20 ("the Subject Property").[1] On December 13, 2011, the Lemasters executed and entered into an oil and gas lease with PetroEdge Energy, LLC, which covered

_____

[1] The property is also described in the deed of record located in the Office of the Clerk of the County Commission of Tyler County.

1

the Subject Property (hereinafter the "EQT Base Lease" or "Base Lease"). EQT was assigned the Base Lease through certain mesne, or intermediate, conveyances.

A Memorandum of the Base Lease ("Base Lease Memorandum") was recorded on January 12, 2012.[2] It provided that the primary term of the lease commenced on December 13, 2011, and terminated five years thereafter, on December 13, 2016, unless oil and gas was produced or capable of being produced on the Subject Property during the primary term of the lease, or EQT was otherwise operating on the Subject Property in search of oil and gas during the primary term. It is undisputed that EQT did not commence operations to produce oil and gas during the primary term. Significantly, the terms of the Base Lease did not grant EQT an express right of first refusal, right of renewal, or automatic option to extend its primary term, and therefore the Base Lease Memorandum did not operate to provide notice of any such right. *See* W. Va. Code § 40-1-8 (discussed infra in greater detail).

In 2016, prior to the expiration of the primary term of the Base Lease, the Lemasters executed and entered into a written oil and gas lease with Antero (hereinafter

---

[2] *See* W. Va. Code § 40-1-8 (2019) (providing for the recording of a memorandum of a lease instead of the actual lease).

2

the "Antero Top Lease" or "Top Lease").[3] This lease was dated June 24, 2016, but made effective December 14, 2016, immediately upon the expiration of the primary term of the EQT Base Lease.[4] The Antero Top Lease covered the Subject Property for a primary term of five years from the effective date. In consideration for the Lemasters' execution of the Top Lease, Antero paid them in two separate installments. The initial installment was for 5% of the total consideration for the Top Lease, or the amount of $2,478.13, which sum was paid at the time of signing and which the parties agreed was sufficient consideration to form a binding contract. The second installment was for the remaining 95% of the total

---

[3] The Court recognized the following definition of a "top lease" in *Chesapeake Appalachia, LLC v. Hickman*, 236 W. Va. 421, 781 S.E.2d 198 (2015):

> Properly defined, a top lease is "a lease granted by a landowner, during the existence of a recorded mineral lease, which is to become effective if and when the existing lease expires or is terminated." J. Zak Ritchie, "A Fresh Look at an Old Tort: Litigating Slander of Title in Mineral Disputes," 115 W.Va. L. Rev. 1097, 1118 (2013). *See also*, Patrick H. Martin and Bruce M. Kramer, 8 *Williams & Meyers Oil and Gas Law* 1083 (2014) (A top lease is "[a] lease granted by a landowner during the existence of a recorded mineral lease which is to become effective if and when the existing lease expires or is terminated.").

236 W. Va. at 438, 781 S.E.2d at 215.

[4] It is undisputed that the Antero Top Lease did not preclude EQT from commencing operations under the Base Lease during the primary term, which ended on December 13, 2016.

3

consideration, or the amount of $47,048.38, which was subsequently mailed to the Lemasters within fifteen business days of the effective date of the Top Lease.[5]

A Memorandum of the Antero Top Lease ("Top Lease Memorandum") was recorded August 30, 2016. The Top Lease Memorandum provided, in pertinent part:

> Lessor [the Lemasters] covenants and agrees that, as of the date Lessor executes this Lease, *Lessor has not agreed to extend, amend, modify, or renew the Existing Lease [the Base Lease], or to take any action which would result in such extension, amendment, modification, or renewal of the Existing Lease, and Lessor further covenants and agrees that Lessor shall not enter into any such agreement or take any such action at any time after the date Lessor executes this Lease.*

(Emphasis added). The Top Lease also provided:

> Lessor and Lessee [Antero] acknowledge that the lands described in this [Top] Lease are presently subject to Oil and Gas Lease dated December 13, 2011 and set to expire on December 13, 2016 . . . (the "Existing Lease"). This [Top] Lease is granted on Lessor's reversionary interest in the leased premises and is hereby vested in interest, but, as subject to the Existing Lease, the interest covered by this [Top] Lease shall vest in possession upon the termination of the Existing Lease.

Notwithstanding the express terms of the Antero Top Lease and the recorded Top Lease Memorandum, the Lemasters and EQT entered into an Amendment and Ratification of Oil and Gas Lease (the "Base Lease Amendment"), dated September 24,

---

[5] It is undisputed that Antero timely tendered both payments to the Lemasters; however, according to Antero, the Lemasters' counsel returned the $47,048.38 payment to Antero by letter dated January 31, 2017.

4

2016, and recorded December 12, 2016. In the Base Lease Amendment, the Lemasters and EQT agreed, inter alia, to extend the primary term of the Base Lease for an additional five years.

An EQT employee, Russell Greathouse, testified during a deposition that multiple EQT employees, including John Damato, George Heflin and Becky Heflin, were aware of the Antero Top Lease prior to EQT's execution of the Base Lease Amendment. Mr. Heflin testified that Mr. Greathouse and Steven Prelip, also an EQT employee, had a copy of the Memorandum of Antero Top Lease. Mr. Heflin acknowledged that he knew and understood that in the Antero Top Lease, the Lemasters had covenanted with Antero not to voluntarily extend or amend the EQT Base Lease.

On March 16, 2017, Antero filed an amended complaint against EQT and the Lemasters in circuit court, asserting claims for breach of contract, intentional interference with contractual relationship, declaratory judgment, and slander of title. Relevant to the instant appeal, is Antero's declaratory judgment count in which Antero asked the circuit court to declare that: 1) the Base Lease Amendment was ineffective and invalid as to Antero; 2) the Antero Top Lease was the only valid lease affecting the Subject Property, and 3) the Base Lease Amendment was invalid or, in the alternative, subordinate to the Antero Top Lease.

On March 28, 2017, EQT served its answer to the amended complaint and counterclaim in which it asserted a declaratory judgment count asking the circuit court to declare that the Base Lease, as amended, was the only lease in effect regarding the Subject Property and that the Antero Top Lease was subject to the Base Lease and Base Lease Amendment.

On November 5, 2018, Antero filed a motion for partial summary judgment on its claims for intentional interference with a contract and declaratory judgment. On November 26, 2018, EQT filed a response in opposition and a cross-motion for summary judgment on its counterclaim for declaratory judgment. Thereafter, by order entered January 3, 2019, the circuit court granted Antero partial summary judgment and denied EQT's cross-motion for summary judgment. The circuit court determined that under the West Virginia Recording Act ("Recording Act"), West Virginia Code §§ 40-1-8 to -9 (2019), the Base Lease and Base Lease Amendment are subject to the Antero Top Lease, and the Antero Top Lease is the valid and existing oil and gas lease covering the Subject Property. On May 23, 2019, the circuit court amended its January 3, 2019, order, finding that its award of summary judgment in favor of Antero on its declaratory judgment claim was a final order subject to immediate appellate review under Rule 54(b) of the West

6

Virginia Rules of Civil Procedure.[6]  This order, and the January 3, 2019, order form the basis for the instant appeal.

## II.  Standard of Review

We begin by noting that "[a] circuit court's entry of a declaratory judgment is reviewed *de novo*."  Syl. Pt. 3, *Cox v. Amick*, 195 W. Va. 608, 466 S.E.2d 459 (1995). Applying this standard of review, we examine the issue before us.

## III.  Discussion

The sole issue raised on appeal is whether the circuit court erred by granting summary judgment in favor of Antero on its declaratory judgment claim, by concluding that the Antero Top Lease takes priority over the EQT Base Lease, as amended, covering the Subject Property.  EQT argues that the circuit court's order was in error because: 1) EQT had the right to amend the Base Lease;  2) the conditions necessary for Antero's Top

---

[6] In its January 3, 2019, order, the circuit court also granted summary judgment to Antero on its intentional interference of contract claim against EQT. The court determined that in the Antero Top Lease, the Lemasters had agreed not to amend, to modify or to otherwise extend the Base Lease, which covenant was also set forth in the Top Lease Memorandum.  The Court found that EQT had both constructive and actual knowledge of the Lemasters' agreement not to extend the Base Lease. Despite that actual knowledge and notice, EQT intentionally entered into the Base Lease Amendment with the Lemasters and injured Antero's leasehold rights. In its May 23, 2019, order, the circuit court expressly provided that only its determination of the declaratory judgment counts was subject to an immediate appeal pursuant to Rule 54(b) of the West Virginia Rules of Civil Procedure. Accordingly, the circuit court's grant of summary judgment on the intentional interference with a contract count is not before us in the instant appeal.

Lease to become effective did not occur and, therefore, the Top Lease is subordinate to the Base Lease; 3) the recording of the Top Lease did not render the Base Lease, as amended, subordinate, and 4) the "no-modification clause" included in the Top Lease is unenforceable and void as against public policy.[7] We reject EQT's arguments.

While EQT focuses on its "absolute right" to amend its Base Lease as the controlling issue in this case, we find that the determinative issue is which lease – the Base Lease, the Base Lease Amendment or the Top Lease – is superior or has priority. This Court has recognized that leases are controlled by principles of contract law. As this Court stated in *Chesapeake Appalachia*, 236 W. Va. 421, 781 S.E.2d 198 (2015), "[t]o be clear, the leases at issue are to be construed like any other contract. An oil and gas lease (or other mineral lease) [is] both a conveyance and a contract." *Id*. at 434, 781 S.E.2d at 211; *see also Leggett v. EQT Prod. Co.*, No. 1: l3CV4, 2016 WL 297714, at *4 (N.D.W. Va. Jan. 22, 2016) (same); *Iafolla v. Douglas Pocahontas Coal Corp.*, 162 W. Va. 489, 250 S.E.2d 128 (1978) (applying contract law to mineral lease). Under principles of contract, therefore, EQT was free to amend its Base Lease, and the Lemasters had the right to enter into the Top Lease with Antero.

---

[7] Because this argument concerns the intentional interference with a contract claim which is not before us on appeal, we decline to address this argument. *See supra* note 6.

However, the issue of which lease has priority when multiple leases exist on the same property is governed by the Recording Act, West Virginia Code §§ 40-1-8 to -9. West Virginia Code § 40-1-8 provides for the recording of a memorandum of a lease instead of the actual lease as follows:

> Any contract in writing made in respect to real estate or goods and chattels in consideration of marriage; or any contract in writing made for the conveyance or sale of real estate, or an interest or term therein of more than five years, or any other interest or term therein, of any duration, under which the whole or any part of the corpus of the estate may be taken, destroyed, or consumed, except for domestic use, shall, from the time it is duly admitted to record, be, as against creditors and purchasers, as valid as if the contract were a deed conveying the estate or interest embraced in the contract. In lieu of the recording of a lease pursuant to this section, there may be recorded with like effect a memorandum of such lease, executed by all persons who are parties to the lease and acknowledged in the manner to entitle a conveyance to be recorded. *A memorandum of lease thus entitled to be recorded shall contain at least the following information with respect to the lease: The name of the lessor and the name of the lessee and the addresses of such parties as set forth in the lease; a reference to the lease, with its date of execution; a description of the leased premises in the form contained in the lease; the term of the lease, with the date of commencement and the date of termination of such term, and if there is a right of extension or renewal, the maximum period for which, or date to which, the lease may be extended, or the number of times or date to which it may be renewed and the date or dates on which such rights of extension or renewal are exercisable. Such memorandum shall constitute notice of only the information contained therein.*

(Emphasis added). The significance of the statutory requirement that a memorandum of lease contain certain specific information set forth in the lease including, inter alia, the term of the lease, the commencement and termination dates of the lease, and if there is a right

9

of extension or renewal including specific details for such extension or renewal, is that this type of information provides notice and basic fairness to other potential good faith purchasers or "bona fide purchasers." Syl. Pt. 5, *Kourt Sec. Partners, LLC v. Judy's Locksmiths, Inc.*, 239 W. Va. 757, 806 S.E.2d 188 (2017) ("A bona fide purchaser is one who actually purchases in good faith." Syl. Pt. 1, *Kyger v. Depue*, 6 W.Va. 288 (1873)."); *see Trans Energy, Inc. v. EQT Prod. Co.*, 743 F.3d 895, 904 (4th Cir. 2014) (providing that a bona fide purchaser is "'one who purchases for a valuable consideration, paid or parted with, without notice of any suspicious circumstances to put him on inquiry." *Stickley v. Thorn*, 87 W.Va. 673, 106 S.E. 240, 242 (1921). This rule protects good faith purchasers who conduct due diligence prior to purchasing an interest in real property. *See Gullett v. Burton*, 176 W.Va. 447, [451-52], 345 S.E.2d 323, 327 (1986)."); *see also* Syllabus, in part, *United Fuel Gas Co. v. Morely Oil & Gas Co.*, 101 W. Va. 83, 131 S.E. 716 (1926) ("To be protected [under the Recording Statute] . . . against a prior unrecorded deed, one must be a complete purchaser, *must have had no notice* of the prior contract or deed, and have paid all the purchase money for the land purchased by him." (emphasis added).

Further, West Virginia Code § 40-1-9 provides:

> *Every such contract*, every deed conveying any such estate or term, and every deed of gift, or deed of trust or memorandum of deed of trust pursuant to section two, article one, chapter thirty-eight of this code, or mortgage, *conveying real estate shall be void*, *as to* creditors, and *subsequent purchasers for valuable consideration without notice, until and except from the time that it is duly admitted to record* in the

10

> county wherein the property embraced in such contract, deed,
> deed of trust or memorandum of deed of trust or mortgage may
> be.

*Id.* (emphasis added). Hence, where a real estate contract is unrecorded and purports to convey real estate to a subsequent bona fide purchaser for valuable consideration without notice, it is void. *Id.* Accordingly, we hold that where multiple leases, such as an oil and gas base lease and a top lease, exist on the same property, the provisions of the West Virginia Recording Act, West Virginia Code §§ 40-1-8 to -9 (2019), govern which lease has priority.

In the instant case, according to the original terms of the EQT Base Lease, which were duly recorded in the Base Lease Memorandum, the Base Lease expired on December 13, 2016, unless oil or gas was produced on the Subject Property during the primary term of the lease or EQT was otherwise operating on the Subject Property. It is undisputed that neither of these events occurred; therefore, it was impossible for Antero to have had actual or constructive notice of any right of EQT to extend the Base Lease beyond its primary term because other than the two events described above occurring, no such right existed.

In summary, Antero entered into the Top Lease with the Lemasters on June 24, 2016, prior to the expiration of the term of the EQT Base Lease, and recorded the Top Lease Memorandum August 30, 2016, in compliance with West Virginia Code § 40-1-8. According to West Virginia Code § 40-1-9, Antero was a bona fide purchaser under the

11

terms of the Top Lease because it had no notice of the EQT Base Lease extending beyond its original term of December 13, 2016.[8] All that Antero knew or could have known from the recorded EQT Base Lease Memorandum was that the EQT Base Lease expired on December 13, 2016. *See Eagle Gas Co. v. Doran & Assocs., Inc.*, 182 W. Va. 194, 197, 387 S.E.2d 99, 102 (1989) ("In general a party without *actual notice* may rely upon record titles in the office of the clerk of the county commission of the county in which the land is located. W. Va. Code, 40-1-9 [1963]."). As a matter of fact, EQT did not even seek to extend the primary term of its Base Lease with the Lemasters for another five-year period until *after* the Antero Top Lease Memorandum was recorded. As the record reflects, the Base Lease Amendment was dated September 24, 2016, and was not recorded until December 12, 2016. Because Antero's Top Lease Memorandum was recorded *before* EQT's Base Lease Amendment, Antero's Top Lease has priority over EQT's Base Lease and Base Lease Amendment. *See Heck v. Morgan*, 88 W. Va. 102, 106 S.E. 413, 417 (1921) (where subsequent lessee claimed he was a bona fide purchaser without notice of a lessee

---

[8] EQT also argues that Antero had no "present property interest" conveyed by the Top Lease, and therefore the Top Lease "was not in effect at the time" EQT amended its Base Lease to extend its primary term." According to EQT "[n]either the existence nor recording of the Top Lease, or language within that Top Lease purporting to preclude modification of the Base Lease (the 'no modification clause')," acted to preclude EQT from preserving its interest in the property. This argument is without merit. Pursuant to its terms, the Antero Top Lease was a binding contract upon its signing; it provided that "it hereby vested in interest, but as subject to the Existing Lease[,]" as of the date the Top Lease was executed. Further, the Lemasters and Antero agreed the initial installment paid by Antero to the Lemasters was "sufficient consideration to form a binding contract between Lessor and Lessee."

12

under a prior lease, which was not recorded, the Court agreed with the argument that his lease took priority over the prior lease, but disagreed with the facts, stating "[t]he defendant . . . claims that he was a purchaser for value in good faith, and without notice of the plaintiffs rights under the lease which had been theretofore executed to him by Morgan, and that therefore his rights under the lease executed to him by Morgan in September, 1919, are superior to the rights of the plaintiff, and this would be correct if the facts justified this conclusion, for under our recording statutes the plaintiffs lease would be void as to a purchaser for value in good faith without notice.").[9]

Based upon a straightforward application of the Recording Act, we conclude that the circuit court did not err in declaring that the EQT Base Lease and Base Lease Amendment are subject to the Antero Top Lease, and the Antero Top Lease is the valid and existing oil and gas lease covering the Subject Property.

---

[9] *See Rorex v. Karcher*, 224 P. 696, 697-98 (Okla. 1923) (holding that "[t]here was no provision in the lease contract granting an extension or right of extension to the lessees, and any extension procured by the lessees was subject to the rights of intervening third persons. Prior to the time the extension was procured, the rights of the plaintiff intervened by reason of his lease, and any extension granted after the execution of the lease to the plaintiff was taken subject to the rights of the plaintiff under his lease."); *see also Willan v. Farrar*, 124 N.W.2d 699 (Neb. 1963) (finding that actions taken by a base lease lessee subsequent to the execution of a top lease does not affect the rights of a top lessee.).

## IV.  Conclusion

For the foregoing reasons, we affirm the orders of the Circuit Court of Tyler County.

Affirmed.